ARMISTEAD et al. v. SOUTHWORTH et al.*

(In Banc.  May 4, 1925.)

[104 So. 94.  No. 24414.]

1. DRAINS. *Assessment roll held properly vacated on a change in the plans whereby some of the land of the district will be damaged.*

   The original assessment roll, in proceeding for creation of a drainage district, is properly vacated on a material change in plans being made, whereby part of the land of the district will be damaged by a levee for the benefit of the remainder.

2. DRAINS. *Commissioners may change plans only in minor details.*

   The changes in plans of ditches and drains which Laws 1912, chapter 195, section 17, authorizes the district commissioners to make, are only in minor details, and not a complete change of original scheme, as running a levee through the district protecting part of it to the damage of the other part, without any change in assessment.

3. DRAINS. *Statute held to provide an alternative plan for organization of district on petition of majority of landowners.*

   Laws 1912, chapter 195, section 2, as amended by Laws 1914, chapter 269, *held*, in connection with subsequent section, to provide a complete alternative plan for organization of district, so that petition for establishment being signed by a majority of the landowners and this fact found on first hearing provided by section 1, establishment is ordered, "without further inquiry;" that is, without the intervention of temporary engineers and commissioners, necessary under section 1 where petition is signed by a smaller number.

4. DRAINS. *Decree organizing district held not void because of defect in notice of hearing.*

   That notice of hearing on petition for creation of a drainage district assumed, as was the fact, that a majority of landowners had signed the petition, a thing to be judicially found, did not render void, after lapse of time to appeal, the decree organizing the district without further inquiry, as provided by Laws 1912, chapter 195, section 2, as amended by Laws 1914, chapter 269, where petition is signed by such majority, and such fact is found.

*Headnote 1.  Drains, 19 C. J., section 244 (1926 Anno); 2. Drains, 19 C. J., section 156; 3. Drains, 19 C. J., section 82; 4. Drains, 19 C. J., section 73.

APPEAL from chancery court of Leflore county.

HON. C. L. LOMAX, Chancellor.

Proceeding for creation of the Abotlopoota Drainage District. From a decree on the assessment hearing, J. W. Armistead and others, commissioners of the District, appeal, and S. P. Southworth and others, objectors, bring cross-appeal. Affirmed, and remanded for further proceedings.

*E. L. Mounger* and *H. C. Mounger,* for appellants.

The various steps relating to the organization of the district show that the district was duly organized. Numerous objections and exceptions were filed to the assessment. The parties generally had signed a petition for the organization of the district, but when it came to paying their share of the expense, that was another matter.

The commissioners, after due deliberation and consultation, found that those having land north of Catfish bayou—Carroll County Gravel Highway didn't want to be assessed for the proposed improvements, while those having land south of said line, with two or three exceptions, wanted to be assessed for the proposed improvement, and needed and wanted drainage. In order to meet said objections and with the desire to meet the wishes of all parties, they called on the engineer to see if he could devise a plan by which those north of said line could be relieved from the assessment, while those south of said line could be given the benefit of the drainage which was so necessary and which they so much desired.

On page 484 of the record will be found a minute of the meeting of the commissioners of date October 6, 1923, in which it ordered that the engineers of this district be authorized and directed to make such additional survey as may be necessary to determine if it is practical to change the location of the levees in order to exclude from taxation the lands north of the approximate line of Catfish bayou and the lands north of Catfish bayou-Carroll

County Gravel Highway. This was done in order to meet the objections of these parties who were objecting, and who are not the appellees.

It was thought by the commissioners that this surely would satisfy the appellees. They would be relieved from taxation, while those who desired and needed the drainage below Alligator Slough and Catfish bayou would get it and pay for it, and the commissioners could not see why the appellees could complain.

Acting under section 17, chapter 269, Laws 1914, which amends chapter 195, Laws 1912, the commissioners decided to change the plan.

The commissioners filed a report with the court recommending the supplemental report of the engineer on October 10, 1923. The decree of the Chancellor recites: "This matter coming on to be heard, and the commissioners of said district having presented their changed plans, with report of engineer, map and specifications this day filed, it is ordered that said changed plans be filed and that publication be made by the clerk according to law, returnable on the third day of November 1923."

Now our contention is that under section 17, chapter 269, Laws 1914, the commissioners had the right to change the plan of the district, and that the court had nothing to do with it; that they tracked the law when they reported the plan to the court, and notice was given to the property-holders. The statute does not provide that the property-holders may contest the adoption of the changed plan, but simply that if by reason of such change of plans, any property-owner deem that the assessment has become inequitable, he may petition the board of supervisors, or in this instance the Chancellor who shall thereupon refer his petition to the board of commissioners of the district, who shall re-assess his property, increasing or diminishing his assessment as they may find just. This was all that could be done in reference to the changed plan.

The court has nothing to do in the first instance with the adoption of the plan. That is a matter for the commissioners. See sections 1, 4 &.6 Chapter 269, Acts 1914. The changed plan was intended, by a levee running east and west along Alligator bayou and Catfish bayou, and using the Carrollton road, to prevent the surface water from coming down on the people to the south. It did not contemplate stopping up watercourses.

The question is whether the court has a right to do away with the changed plan altogether. (I) The First Assignment of Error is: The court erred in admitting testimony in regard to the organization and establishment of the district, and as to the sufficiency of the petition and other proceedings in the establishment over the objection of the district, when the district had already been established, and the question was *res adjudicata;* and the court erred in not ruling out said testimony.

There was a hearing in reference to the changed plan and the assessment roll. The establishment had already been effected by a decree of the court, and could not now be inquired into. It was *res adjudicata.* See section 3, chapter 269, Acts 1914. There was no appeal as therein provided. *Wilkinson* v. *Gaines,* 96 Miss. 692; *Wheeler* v. *Bogue Phalia D. D.,* 106 Miss. 619; *Milsaps* v. *Bogue Phalia D. D.,* 64 So. 378.

The question of the establishment of the drainage district, the sufficiency of the petition, the number of signatures, and any inquiry about the proper establishment of the district were precluded by the decree establishing the district.

(II) The court erred in admitting testimony in regard to damage to landowners North and East of the proposed levee, over the objection of the district. The only damage would be the holding up of the overflow water from three to six inches higher for about a mile on land already overflowed.

This is surface water which is liable to overflow the lands to the North of the proposed levee, every year.

The building of the levee across on the other side of the river in the plan of the Bear Creek drainage district would have a tendency to receive and hold the flood waters on these same lands.

And so would the building of any levee against surface waters. The building of a levee on the Arkansas side of the Mississippi River has a tendency to hold up the flood waters on the Mississippi side. These waters were vagrant surface waters, and flood water collecting over the land during the rainy season and overflows. It was not proposed to stop up any natural watercourse.

If the building of the levee incidentally held up for a short time the surface water or vagrant flood water on the land north of the proposed levee it was *damnum absque injuria,* and the landowners to the south had a right to levee against these waters. *Indian Creek Drain Dist.* v. *Garrott,* 123 Miss. 320; *Moore* v. *Swamp D. Co.,* 88 So. 522; *Holman* v. *Richardson,* 115 Miss. 169, 178, 179; *Jones* v. *George,* 126 Miss. 576, 89 So. 231; *Jones* v. *Bell,* 89 So. 237.

The facts and conditions in the case of *Jones* v. *George,* 126 Miss. —, 89 So. 231, and *Jones* v. *Bell,* 89 So. 237, are exactly similar to those of the case at bar except that in those cases the effort was to build the levee across so as to dam Burr bayou and in this case it is sought to build the levee along the south side of the bayou, leaving it open. To sustain the Chancellor it is necessary to overrule these two cases and the case of *Indian Creek Drain Dist.* v. *Garrott, supra.*

(III) The court erred in decreeing that the commissioners have no right to adopt the said changed plan. The law vested the commissioners with the discretion and authority to choose the plan in the first instance, with the assistance of the engineer, and gave them the same discretion and authority to change the plan. The court has nothing to do with the selection of either the original plan or the new plan.

The court is not supposed to be an engineer. The plan was deemed feasible and practical by the two commissioners and the engineer. The commissioner wanted to stop up a natural watercourse, and to go on with the original plan. The original plan met with overwhelming objection. Not when adopted, but when the assessment was adopted. The objectors wanted to get out. So the changed plan was adopted pursuant to the statute, by which the objectors, with a few exceptions, were let out, and those who wanted the changed plan and the relief contemplated thereby were included.

How can the objectors complain? They objected when they were included, and object now that they are let out. They are not burdened with any of the cost. If the commissioners had a right to adopt the changed plan, they had a right to make an assessment thereunder. The commissioners and engineer adjudged that the assessment was equitable and just.

Some modification of the assessment was made at the hearing. If other modification is deemed just and equitable, a further modification can be made, and no doubt will cheerfully be made. There is no ground for vacating the whole assessment. How can those North of the line complain when they are not included? These people below the proposed levee need the relief, and, with two or three exceptions, are willing to pay for it. Why should they be denied such relief?

In this matter the commissioners and engineer seem to have acted all the way through with the utmost good faith, and to have been governed by what they considered the best interests of the public. We respectfully submit that the decree should be reversed, and these people be given the relief which they desire and so urgently need.

*Gardner, Odom & Gardner,* for appellees.

(I) THERE WAS NO VALID DRAINAGE DISTRICT ORGANIZED. While the drainage district in this case purports to

have been organized under chapter 195 of the Laws of 1921, as amended, we insist that these statutes were not complied with and that the entire procedure in this case was arbitrary and a plain abuse of the power conferred by said statutes.

There is nothing in the record that discloses that an engineer was duly appointed by the court or had any opportunity whatever to make a survey for the district. In fact, the record in this case clearly discloses that the court attempted to permanently organize the drainage district and saddle same on the landowners therein without any investigation whatever as to the cost, the nature of the improvements needed, and whether or not it would result in damage or benefit to said property-owners.

We do not charge that the court intentionally disregarded the right of the landowners within the proposed district, because it is apparent from the record that the court, in organizing this district, was trying to follow section 2, chapter 195, Laws 1912, as amended by chapter 269, Laws of 1914, same being section 4438, Hemingway's Code, which apparently authorizes the establishment of a drainage district without any preliminary investigation as to cost of improvements and whether or not same would be beneficial to the landowners of the district. We take the position, however that in order to organize a valid drainage district, the preliminary investigation set forth in chapter 213, Laws 1922, must be made, regardless of section 4438, Hemingway's Code, above mentioned. In other words, we do not think that a drainage district can be legally organized unless the court, on a preliminary hearing of a proper petition filed by the landowners, enters an order on the minutes appointing an engineer, and we do not believe that this engineer has any authority to act without giving the required bond. We believe that it is necessary to the establishment of a valid district, that the engineer so appointed must make a careful survey of the territory

and obtain certain information to be filed with the court, which is absolutely necessary before the court can intelligently say whether or not the establishment of the drainage district will promote public health and agriculture, or be for the public benefit.

We believe, however, that section 4438, Hemingway's Code, is a nullity. In the first place, it must be considered in connection with, and as following, chapter 213, Laws 1922, which we have heretofore carefully analyzed so as to set forth the various steps required in organizing a drainage district.

With chapter 213, Laws 1922, well in mind we invite the court's attention to section 4438, under consideration. We note that the first part of the section is nothing more than a jumble of words, and it is absolutely impossible to determine what the legislature meant in using these terms. In the next place, we insist that the provisions of section 4438 are in direct conflict one with the other, which renders the operation of the statute impossible.

Counsel for appellant insists that the question of whether the district was properly organized or not is not an issue in this case, because the order of the court establishing the district precludes any inquiry into matters taking place prior to the entering of said order. He relies on section 4439, Hemingway's Code, and *Wilkinson* v. *Gaines,* 96 Miss. 692, 51 So. 718; *Wheeler* v. *Bogue Phalia Drainage Dist.,* 106 Miss. 619, 64 So. 375.

As we construe the statute and the cases relied on by counsel, the order establishing the district is only conclusive as to matters of fact and does not preclude an inquiry where, in organizing a district, the requirements of the law have not been complied with. Under counsel's view of the statute and cases cited, if the court should arbitrarily enter an order on its minutes declaring a certain district established, there could be no inquiry by the landowners in the territory embraced therein, regardless of whether or not a petition had been

signed by the landowners asking that the district be created. We respectfully submit that this is not the law, and that in the case at bar, since we have pointed out that certain statutory requirements have not been complied with, these authorities are inapplicable.

(II) We next take the position that the court properly decreed that the commissioners had no authority to adopt the new plans filed with the court, and that the assessment rolls were properly vacated. Counsel for the appellant relies on section 17, chapter 195, Laws 1912, as amended, same being section 4463, Hemingway's Code. We would not insist that the foregoing section does not authorize certain changes as to the plans of drainage within a drainage district before any construction work has been begun under the original plan, but the point we make is that the proposed changes in the present plan are so radical as to be equivalent to the organizing of an entirely new drainage district. We do not believe that such a construction should be placed upon this section as to tolerate the procedure followed in this case.

(III) The appellant complains because the Chancellor decreed that the landowners in the northern portion of the district as originally organized were entitled to damages which might result because of the building of a levee between the northern and southern portions of the district.

We see little argument that can be made in favor of counsel's position. We are aware of, and familiar with, the cases relied on by counsel. Typical of these cases is the case of *Indian Creek* v. *Garrott,* 123 Miss. 320, 85 So. 312. We are not in full accord with the holding of the court in the above case, but rather inclined to the view expressed in the dissenting opinion in that case. However, we do not think that the *Indian Creek case, supra,* is in conflict with our contention. In that case, and all other cases cited by counsel, the maxim of *damnum absque injuria* was applied to lands lying outside of the drainage

district. The situation here is entirely different and governed by statute. We are asking for damages to lands lying within the district as originally created. Such damage is clearly allowed by statute, and it is as much the duty of the commissioners of a drainage district to assess the damage to lands lying within the district as it is to assess the benefits to such lands. Certainly there can be no argument as to this, because the meaning of the statute cannot be misunderstood. In section 7 of chapter 195, Laws 1912, as amended, the legislature, after providing for the assessment of benefits, used the following language: ''The commissioners shall also assess and pass upon said roll or book of assessment, opposite each tract of land, all damages that will accrue to any landowner by reason of the proposed improvement, including all injury to lands taken or damaged.

We, therefore, respectfully submit that the case should be affirmed on direct appeal and reversed on cross-appeal.

*R. C. McBee,* also for appellees.

(I) Notice of Organization Invalid. It is first contended that the notice published upon the presentation of the petition is invalid. It notifies all property-owners on the hearing that: ''Unless a majority of the landowners, etc., shall object to its organization'' the court will proceed with the organization. The effect of this notice was such that when an individual landowner read it, he was not informed that he might appear and object. He was told in effect that he must not only appear but must interest the other landowners in a sufficient number, so that when they presented themselves, a majority would be had. In other words, it was a group objection and not an individual objection that would be heard. Whereas, clearly, to be affected, the owner as an individual must be granted a hearing. 32 Cyc. 484; Section 4435, Hemingway's Code, section 1, chapter 269, Laws 1914.

The section above quoted provides for the hearing which is referred to in section 4438. Until such a hearing is had, it is not only not contemplated by the law, but improper to file the majority petition referred to in that section. And it is only ''upon the hearing provided that the majority petition is filed under that section, the objection of a single objector must be heard. If the objectors are present in sufficient number to constitute a majority under the last-named section, it is true that ends it, but if they are not present in such number, it is ''the duty of the Chancellor to establish the district only if it appear that the establishment would be necessary for the promotion of public health and 'for agricultural purposes.''

We have seen that the above notice did not contemplate any such hearing. In notifying the parties in effect that no objection would be considered and no evidence heard unless presented by groups and not by individuals sufficient in number to constitute a majority number, it is submitted that the defendant by such notice and by the judgment rendered thereon, has been deprived of his property without due process of law. *Home Telep. & Teleg. Co.* v. *City of Los Angeles, et al.,* 227 U. S. 278, 57 L. Ed. 510.

When the act under which this district was organized was held to be constitutional by this court, the objection was then made that the due process clause of the Constitution was violated as well as other clauses and the constitutionality of the act was upheld because: ''The statute prohibits the board from taking up the matter for consideration until these (taxpayers) shall be given a time for a hearing.'' *Cox* v. *Wallace,* 100 Miss. 526. And, ''That the whole matter of notice, hearing, assessment of damages, etc., is provided for in the act.'' *Jones* v. *Drainage Dist.,* 102 Miss. 796.

Under these two decisions the hearing to the individual taxpayer was held to be essential, and such hearing saved the statute from being unconstitutional. Here he was

denied such hearing, and for that reason the entire proceeding is void. It is contended that this is a collateral attack upon the decree of the court organizing the district. We do not here stop to cite authorities but if the decree be void then it can be attacked anywhere or at any time collaterally or directly.

The decree was obtained by fraud and is therefore void. It is first submitted that a decree is void: "A decree obtained by fraud is void both at law and equity, and may be so treated in any collateral proceeding in either forum." *Plummer* v. *Plummer*, 37 Miss. 185. "Fraud vitiates everything and may be collaterally attacked and this applies to the judgments and decrees of all courts." *Christian* v. *O'Niel*, 46 Miss. 670; *Richardson* v. *Brooks*, 52 Miss. 118.

While the courts do not define fraud, they do say it is a device whereby another is deceived. Here we account for the signatures of thirty-eight persons who were deceived into the signing of the petition.

It is respectfully submitted that the judgment was fraudulent and therefore void.

(II) HAVE THE COMMISSIONERS AUTHORITY TO ADOPT THE CHANGED PLAN? Counsel in his brief says that they have the right to make a change, and as authority for such statement, refers to section 17, Laws of 1914, chapter 269, section 4463, Hemingway's Code.

Our construction of this section is that it refers to general alterations made in the plan of ditches and drains, because it says so in so many words, and it is not authority for changing a levee plan. However that may be, in the latter part of the section appears this limitation: "No change of plans as above authorized shall be made so as to lower the standard of efficiency of the proposed system of improvement."

There is but little argument that can be made under the state of facts here shown. The proposed system of improvement contemplated the protection of two-thirds of the district now excluded from overflow from the Ya-

zoo River. It contemplated the building of an elaborate system of canals and lateral ditches to take care of the water coming from the hills. This has been entirely abandoned by agreement with the landowners and commissioners and by order of the commissioners. Surely this change "lowers the standard of efficiency of the proposed system of improvement" and cannot be permitted under the only section which counsel says, grants him authority to make the change. Furthermore when the original plan is abandoned for a changed plan, the original assessment must be abandoned for a changed assessment, and notice of that assessment must be published as is required of the original assessment and such notice cannot be published unless and until the notice required of the change in plans is first published.

(III) IS THERE A VALID ASSESSMENT? We have seen from the record that what is called the "Levee Assessment Roll" appearing in the record at page 78, was filed August 15, 1923, and notice published. This notice, which appears in the record at page 167, required the property-owner to appear on the 29th of September to object if he so desired. On that day, the day for the hearing of objections, the canal assessment roll, totalling eighty thousand dollars was filed. The cost of the improvement under each assessment roll was eighty thousand dollars, in round numbers a total of one hundred and sixty thousand dollars. See section 7 of the Drainage Act, as amended by chapter 269, Laws of 1914, Hemingway's Code, section 4445.

There was utter failure to comply with the above statute because the first assessment roll filed, on which notice was given, did not take into consideration the cost of the canals, which was incurred in the proposed plan which was on file, and did not place opposite each owner's name the amount and benefits of such damages as is required by the above statute, for the cost of the canal.

When the commissioners filed the canal assessmnt roll they gave no notice of that roll. Therefore it follows that no valid assessment was ever made.

(IV) THE SITUATION OF THE LANDOWNERS AS TO DAMAGES. Under the law, if the property-owner claims to be damaged he must give notice in writing thirty days after the assessment is filed. See section 4446, Hemingway's Code (section 8 of Act as amended by the Laws of 1914).

The thirty days allowed to the property-owners expired certainly not later than the 15th day of September, and no property-owner was then advised that the commissioners expected to do anything else than to construct the levee and to dig the canal. Therefore they did not protest, and the time for the filing of protests expired on September 15th, thirty days after the filing of the assessment. This is provided in the statute just quoted, and this court held in the case of *Mineyard* v. *Pelucia Drainage District,* 98 So. 225, 133 Miss. 847, that: "If the property-owner does not object he waives the right to compensation and cannot thereafter propound a claim or proceed to obstruct the work."

My clients were the owners of the lands through which the present levee along Catfish bayou is proposed to be constructed. They made no claim for damages for they had none until their thirty days had expired. After the thirty days had expired, they are met with the defense that this objection comes too late as not having been made within thirty days. It is respectfully submitted that this defense is a vain one and that it takes from these landowners the notice required by their statute and takes their property without due process of law, in violation of the state and Federal Constitution.

(V) THE LAW GOVERNING THE PROPOSED DISTRICT. The original petition recites that this district is organized under chapter 195, Laws of 1912. The petition was filed on the 21st day of April, 1922. The Law of 1912 above referred to was amended by chapter 213, Laws of 1922.

I think it a fair guess that whoever drew the petition drew it without ever having seen this law, which was passed on April 8th, just thirteen days before the petition was filed.

This Act of 1922 required that a notice shall be published and upon the filing of the report of the Engineer, a second notice is required, and it is only upon the hearing called for by the second notice that a district can be organized, and until such notice is published, it is impossible under that law to organize the district.

It is impossible to make one notice two notices. All the reason of mankind and the logic of the ages cannot make one single thing be two single things. For that reason the entire proceeding is necessarily void. It is respectfully submitted that this district cannot function under the original plan, because the commissioners have agreed with the property-owners not to do so. It cannot function under the present plan, because the commissioners were without authority to change the plans. It cannot function in any event, because the organization and the assessment are void.

*Kimbrough, Tyson & Kimbrough,* also for appellees.

This was a proceeding under chapter 195, Laws 1912, as amended by chapter 269 and chapter 271, Laws of Mississippi 1914, and amendments thereto. It is our opinion that a reversal of the order usually employed in briefing a case, is desirable in this particular cause. We believe a statement of the law under which the district is sought to be organized followed by a statement of the course pursued will present to the court in clearer fashion the points we desire to emphasize, than would a statement of the proceedings followed by a statement of the law.

Chapter 195 of 1912, as amended by chapters 269 and 271, Laws of 1914, as amended by chapter 213, Acts 1922, constitute all of the law involved in this case. On the final hearing in the court below, these appellees, or some

139 Miss.—47.

of them, challenged the jurisdiction of the court, pointing out that the original decree attempting to organize the district was void and that all proceedings had and done subsequent to the filing of said decree were null and void and of no effect.

From sections 1, 2, 3, chapter 195, Laws of 1912, it is very clear that upon the presentation to the board of a petition signed by ten per cent of the owners of real estate, the board is required to enter an order upon its minutes appointing an engineer to make a survey and report back his findings.

It is further very clear that upon the filing of the engineer's report, the clerk is required to give notice to the property-owners of the filing of such engineer's report and of the sitting of the board to hear objections to the creation of the district. Property-owners are not required to appear and object, nor do they have an opportunity so to do until after the engineer's report is in. At that time they have an opportunity to examine the report which shows the character and extent of the work proposed to be done, the location and size of the ditches and the estimated cost thereof. In possession of that information, they are then in position intelligently to consider the desirability or undesirability of proceeding with the organization of the district, and are prepared and qualified to make such exceptions or objections as they desire to make. The board then sits to hear the advocates and opponents of the district and if, after hearing these interested parties, "it deem it to the best interest of the owners of property within the said district, that the same shall become a drainage district, under the terms of this act, it shall make an order upon its minutes establishing same as a drainage district, subject to all the terms and provisions of this act."

It is further perfectly clear that under section 2, if the petition presented, after the coming in of the engineer's report, be signed by a majority of the landholders owning one-third of the land, or a third of the landholders

owning a majority of the land it shall be the duty of the board to make the order establishing the district without further inquiry, provided, however, it appear that the establishment thereof be necessary for the promotion of public health or for agricultural purposes.

It is further perfectly clear that under section 2 that if at the hearing on the notice given, after the filing of the engineer's report, a majority of the land-owners owning a third of the land, or a third of the landholders owning a majority of the land be presented to the board praying that the improvements be not made, it shall be the duty of the board to so order, and if such petition protesting against the organization be not filed, it shall then be the duty of the board "to investigate as provided in the preceding section (sec. 1) and to establish such district, if it is of the opinion that the establishment thereof will be to the advantage of the owners of real property therein."

It appears to us that the foregoing is clearly the procedure outlined under chapter 195 of the Acts of 1912. It nowhere appears in that act that the district can be organized regardless of the number of signers or of the number of acres shown by the petition prior to the appointment by the board of an engineer and of the filing by such engineer of his report. The reason is manifest. All property-owners proposed to be included within the district and proposed to be taxed, and perhaps, damaged, have a right to know the nature and character of the improvements contemplated, the location thereof, the cost and probable benefits or damages which will flow to such property-owner. Until the survey has been made, at least a preliminary survey, and until plans and objections are prepared, the property-owner is in no position to intelligently advocate or oppose the creation of a district.

Coming now to chapter 269, Acts of 1914, as amended by chapter 213, Acts of 1922, we find quite a different state of affairs, especially as to the limitation put upon

the too speedy and ill-considered organization of a drainage district. We find that the board is not allowed to consider a petition containing only ten per cent of the owners of real property, but before it can take any action, the initial petition must be signed by one-fourth or more of such owners. Neither is the board vested with authority to appoint an engineer upon the presentation of a petition, even though it contain the signatures of one-fourth or more of the landowners, until notice by advertisement in a newspaper has been given to the owners of land proposed to be embraced in the proposed district, that the board will, on a day designated in such notice take action "looking to the organization of the 'district."

On the day designated, in the notice, that the board will take action looking to the organization of the district, the board shall hear all objections, if any are offered, to the organization of the district. If at that hearing, a majority of the landowners owning one-half or more of the land proposed to be included in the proposed district shall object to the organization, the board shall not proceed further with the organization; but if such petition protesting against the organization is not filed, and it be determined by the board to proceed with the organization of the proposed district, it shall then enter upon its minutes an order appointing an engineer to be selected by the petitioners or to be named by the board, if the engineer selected by the petitioners be unsuitable. The engineer so appointed by the board shall proceed forthwith to make a survey and make his report as provided in chapter 195, Acts 1912.

Although a hundred per cent of the landowners owning one hundred per cent of the land may have presented their petition for the organization and creation of a district, there is left with them, or reserved by them, the right to change their mind, and file their protests on the day named in the notice, when the board will take action "looking to the organization of the district." The

object in this, of course, is to prevent the incurring of all further or additional expenses. If a majority of the owners owning one-half or more of the land, petition against further action of the board, looking to the organization of the district, the board is without power to proceed further.

It will be observed that two notices by publication are required. First, a notice advising that a petition has been filed and that the board will take action looking to the organization of the district, at which time if the required protests are not filed, it may proceed with the appointment of an engineer. . Second, notice that the report of the engineer has been filed, and that the same may be examined and approved, or disapproved, by the property-owners at a hearing on a date to be named in said notice. It nowhere appears that the district can be organized until after notice of the intention to appoint an engineer and after notice of the filing of the report of such engineer, so appointed. Now read section 2, chapter 269, Acts of 1914.

We have heard it contended that section 2, above quoted, authorizes the filing of what is termed an Initial Mandatory Petition, that is, a petition that authorizes and requires the board (or court) to organize a permanent district, upon the presentation to the board, or court, of the original petition, when signed by a majority of the landholders owning one-third of the land, or signed by one-third of the landholders owning a majority of the land.

This proposition is the point which we desire especially to present in this brief. We take violent issue with those who so interpret section 2. If our contention is sound, the court will be relieved of the burden of studying the record in this case. This district was organized, or attempted to be organized, after the publication of one notice only. Our contention is that it has never been organized; that the decree attempting to organize and create the district is utterly void, and that

all proceedings had thereunder and subsequent thereto are null and void.

·We contend that section 2 of the Act of 1914, alludes clearly and confines itself wholly to the improvements proposed and recommended in the report of the engineer, which report is required to be filed before the creation or organization of the district. The improvements pro· posed cannot be known until after the engineer's report is filed. It then becomes "the duty of the board of supervisors or chancellor, to make the order establishing the district." If upon the day named for the hearing on the engineer's report, a petition, signed by a majority of the landowners owning one-third of the land, or one-third of the land-owners owning a majority of the land, be presented to the board of supervisors praying that such improvements be not made, it shall be the duty of the board of supervisors to so order. "But if no such petition is filed, it shall be the duty of the board of supervisors, or the Chancellor, to investigate as provided in the preceding section, and to establish such drainage district," if it deem the establishment to be to the advantage of the owners of real estate, etc.

We confidently insist that our construction and interpretation of these acts is sound. If so, the Abotlapoota drainage district has never been organized and a laborious examination of a somewhat confused and confusing record is entirely unnecessary. The court was without jurisdiction to permanently organize a district when it did, and of course, the property-owners could not contemplate that the court would go beyond its jurisdiction.

Counsel for appellee contends that the decree organizing the district was *res adjudicata* and that the property-owners' only remedy was by appeal. The property-owners had no legal notice of the organization of the district, or of the contemplated organization at the time and at the place it was organized, or attempted to be organized. They assumed, and had a right to assume

that if sufficient objectors did not appear, the court would appoint an engineer to make a survey, and report thereon.

The engineer's report advising the property-owners of the nature and character of the improvements proposed, the location and cost thereof, and the benefits and damages to accrue, the only source of information to which the owners might repair to determine whether they were in favor of the creation of the district or not, was not filed until eight months after the district had, in fact, been organized. Notice of the filing of the engineer's report was not given to the property-owners until after the filing of the commissioners report of the assessment of lands, on August 15, 1923.

After the alleged organization of the district, when the assessment roll was filed on August 15, 1923, the protestants came trooping in with their objections. Finally the cause was taken up for hearing and the taking of proof began. In the course of the examination it was clearly shown that as a matter of fact, neither a majority nor one-third of the landowners had signed the original petition, the finding of the chancellor to the contrary, notwithstanding.

Counsel for appellant cannot waive the question of the validity of the organization of the district by asserting that the district had already been organized. Some of these appellees were in court for the first time, some were brought in as the owners of additional land, which was sought to be assessed. They had not been embraced in the original district, notice had not been given to them, and they were, therefore, not in court until brought in by notice of the intention of the commissioners to assess them as the owners of additional land, outside of the original district. Manifestly, they were then entitled to raise the question of the jurisdiction of the court, and the authority of the commissioners. This they did, and this point they now press for the consideration of this court.

This is a case, clearly, of the commissioners seeking to protect their individual lands, at the expense of the other property-owners. They were not even willing to eliminate the owners of land in the northern half of the district from the district, but insisted on keeping them in the district, saying to them that they had no just cause for complaint, since they would be drowned and abandoned, but would not be taxed for that privilege.

Counsel states that it will be seen from the testimony that the change in plan was made to satisfy the objectors; that the changed plan was to give relief to the property south of Alligator Slough and exclude from taxation the lands north of Alligator Slough.

We do not deny that it might give a reasonable measure of relief to the land in the extreme southern end of the district, but we insist that the commissioners, who are the chosen representatives for the entire district, can hardly be claimed to be representing the entire district, when they are seeking to protect only a portion of the district, and this to the great disadvantage and damage of more than one-half of the district.

We earnestly urge this court to pass upon and determine the validity of the organization of the district. This question is clearly at issue and if it should be determined that the district has never legally been organized, all other questions are disposed of.

We insist that the Chancellor was correct in holding that the owners of land within the district would be entitled to damages occasioned by the construction of the proposed improvements, within the district; that he was right in quashing the assessment rolls, and that he was right in holding that the commissioners were without authority to adopt and proceed under the changed plans, thereby abandoning the district of and for which they are commissioners, to the local and selfish benefit of not more than one-third of the land originally proposed to be embraced in the district, to the great detriment and damage of the owners of the land in the northern half of the district.

On the question of the sufficiency of the organization, we desire to present only one authority. It is true that case arose under chapter 189 of Laws of 1912, while the proceeding here is under chapter 195. Nevertheless, the case is, we think, determinative of the question pressed by us.

That case is *Commissioners of Camp Creek Drain. Dist.* v. *Johnston et al.,* 71 So. 320.

We respectfully submit therefore that this court must affirm the finding of the court below and further find that the decree attempting to organize the district and all proceedings had thereunder are null and void.

Argued orally by *H. C. Mounger,* for appellant, and *O. L. Kimbrough* and *R. C. McBee,* for appellees.

McGOWEN, J., delivered the opinion of the court.

A petition was filed in the chancery court of Leflore county, Miss., on April 21, 1922, asking for the creation of a drainage district including the lands in three counties, under chapter 195, Laws of 1912, and the amendments thereto. Upon this filing the chancellor directed the clerk to give notice of a hearing at a time fixed by the decree, and directed that the notice state:

"That unless at said hearing a majority of the landowners owning one-third of the land proposed to be included in the proposed district, or one-third of the landowners owning a majority of the land proposed to be included in said district, shall object to such organization, this court will then and there proceed with the organization of said drainage district," etc.

Due publication was made of this notice, no objection was filed to the organization of the district, and, upon the date fixed by the chancellor, he appointed Hon. C. L. Lomax, then a member of the bar, now the chancellor of that district, as a commissioner to ascertain if the requisite number of landowners owning the requisite proportion of the lands in said proposed district were represented on the petition for the organization of the district.

On May 27, 1922, Commissioner Lomax, as directed, filed his report finding as follows: (a) That the publication of the district was duly made (b) that no objection giving notice of the hearing looking to the organizations were filed to the organization of the district. (c) That petitioners were allowed to amend their petition omitting certain lands. (d) The petition was signed by more than one-third of the landowners owning more than a majority of the lands in said district. (e) Recommending that the district be organized. All of which recommendations were by decree of the court approved and permanent commissioners of the drainage district thus constituted were appointed.

On February 14, 1923, the engineers presented their reports with plans, profiles, and specifications of the proposed district, and on August 15, 1923, the commissioners filed a report to the effect that they had assessed the benefits to the lands included in said district, but had assessed no damages to any land, and presented the assessment roll and report, and attached to the report was the assessment of additional lands not included in the original district. Publication was had fixing September 29, 1923, as the date for the assessment hearing. Between the date of the publication, August 15, 1923, and the date for the hearing, September 29, 1923, numerous protests and objections were filed. On October 10, 1923, the commissioners filed an amended report embracing the engineers' report signed by two of the commissioners, and the court directed that notice by publication be given to the landowners as to the changed plans or amended report.

The matter was continued from time to time until January 18, 1924, when the court entered a decree allowing the commissioners to withdraw what was called the canal assessment roll, and on the same date the court also entered the final decree ordering that damages be assessed in favor of the objectors north of the levee proposed in the changed plan to such as might show that the flood waters would damage them on account of the construction of said levee.

This district was in an oblong shape, long and narrow, and the purpose of the changed plan was that, while lands in the original district were retained therein, yet a levee was to be constructed across the district east and west, said levee intended to protect the lands of the southern part of the district as against the lands of the northern part of the district, and while no benefits were assessed in their favor, no damages were allowed for the additional service on account of flood waters, thus necessarily imposed upon the northern lands within the district.

The chancellor held that these landowners in the northern part of the district were entitled to make claim for damages in the materially changed situation. The court then entered a final decree ordering: First, that all of the objectors north of the proposed levee according to the changed plans were entitled to such damages as might be caused by the flood waters on account of the building of said levee. It will be borne in mind that this district was very long, oblong in shape, much longer than wide, and that the commissioners after the district had been organized assumed to change the plans, by which change the district was cut in half by a levee beginning on the west side running toward the east along Catfish bayou, and the court evidently found that the flood waters thus held back by the levee would damage those property owners north of said levee. Second, the court held that the commissioners were without authority to adopt the changed plans. Third, that the commissioners were without authority to apply the original assessment to the materially changed plans. Fourth, the court ordered that the assessment roll filed August 15, 1923, be vacated on account of a material change in the plans.

Objectors contended that the organization of the district was void because section 1, chapter 269, Laws of 1914, as amended by chapter 213 of the Laws of 1922, had been wholly ignored. The objectors further contended that the organization of the district was void because ap-

pearance and objection by an individual property-owner was prejudged and precluded unless he could obtain the statutory majority to join with him therein. The mate-rial part of the notice, is as follows:

"Unless at said hearing a majority of the landowners owning one-third of the land proposed to be included in the proposed district, or one-third of the landowners owning a majority of the land proposed to be included in said district, shall object to such organization, this court will then and there proceed with the organization of said drainage district," etc.

It will be borne in mind that no objection was filed to the organization of this district until after the assessment of the benefits and damages was filed by the commissioners.

The drainage district prosecutes its appeal here, and complains that the court wrongfully held that the commissioners were without power to make the change cutting the district in half and constructing a levee across the district so as to flood the lands of the upper or northern landowners, and vacating the order approving the original assessment. There were numerous other objections, but in view of the conclusion reached by us we shall only notice those stated above.

In determining the points raised in this case it will be necessary for us to consider certain sections of chapter 195, Laws of 1912, as amended by chapter 269, Laws of 1914, the said sections being Nos. 1, 2, and 33 (a) of the latter act. Section 1, chapter 269, Laws 1914, reads:

"That when ten per cent. of the owners of real property within a proposed drainage district shall petition the board of supervisors to establish a drainage district to embrace their property, describing generally the region which it is intended shall be embraced within the district, it shall be the duty of the board of supervisors to enter upon its minutes an order directing the clerk of the board of supervisors to publish a notice, in a newspaper having circulation in the proposed district for two

successive insertions, directed to the owners of land proposed to be embraced in the proposed district, giving notice of the intention of the board to take action looking to the organization of the district and upon the day designated in the notice, the board shall hear all objections, if any are offered, to the organization of said district, and unless at the hearing a majority of the landowners owning a majority of the land proposed to be included in the proposed district shall object to the organization, the board shall proceed as hereinafter provided, but if such a majority shall protest, the board shall determine whether it shall proceed with the organization of said district and if in either event it be determined by the board to proceed with the organization of the proposed district, the board shall enter upon its minutes an order appointing an engineer to be selected by the petitioners provided the engineer whom they select is a suitable person, and if not, naming an engineer satisfactory to the board, who shall give bond payable to the board of supervisors, in a sum not less than $1,000 (one thousand dollars) to be fixed by the board for the faithful discharge of his duties, who shall be liable upon such bond for negligence or incompetency causing loss to the county or district. The engineer shall proceed forthwith to make a survey and ascertain the region which will be benefited by the proposed improvement, and giving a general idea of its character and the cost of drainage and making such suggestions as to the size of the drainage ditches and their location as he may deem advisable. All expenses incident to the survey, legal expenses, and the cost of publication, shall be paid by the county as the work progresses upon a proper showing; but all expenses incurred by the county shall be paid out of the proceeds of the first assessment levied under this act. The board of supervisors, however, when requested by the petitioners, may appoint, as temporary commissioners three landowners of the territory proposed to be drained, to act with the said engineer, who shall take the oath re-

quired by section 268 of article 14 of the Constitution of the state and give bond in a penalty of not less than $1,000 (one thousand dollars), payable to the board of supervisors, and whose term of office shall expire upon the permanent organization of the district which said temporary commissioner may, by and with the consent of the board of supervisors, for the purpose of prosecuting the preliminary work, paying the expenses incident to the survey, attorneys' fees, legal expenses, costs of publication and other necessary expenses, and borrow money at a rate of interest not exceeding 6 per cent. (six per cent.) per annum, and may issue negotiable notes, certificates or evidences of indebtedness therefor, signed by the said three temporary commissioners and payable either within or without the state, to the person or persons from whom such money is borrowed, or bearer, or bearer simply, as said commissioners may elect. The said temporary commissioners may also issue to the engineer or other persons who do the said preliminary work, negotiable evidences of the debt signed by the three said temporary commissioners bearing interest at a rate not to exceed 6 per cent. (six per cent.) per annum. None of the said evidences of indebtedness, so issued, shall run for more than two years, and they shall be nontaxable and said commissioners may pledge all assessments on the lands proposed to be drained for the payment of said evidences of indebtedness; said evidences of indebtedness may be paid off either out of any general fund of the drainage district if organized, or out of the proceeds of the first assessments levied under this act; but in the event that said district is not organized after said indebtedness has been incurred, then the board of supervisors may levy an acreage or an *ad valorem* tax against the lands embraced in the said proposed drainage district in the manner provided under section 4 of this act.

"Upon the filing of the report of said engineer, the clerk of the board of supervisors shall thereupon give notice by publication for two weeks by two insertions, in

some newspaper published and having a general circulation in the county or counties, in which the lands of the proposed district lie, calling upon all persons owning property within said district to appear before the board of supervisors, upon a date to be fixed by the said clerk, which date shall not be earlier than twenty days and not later than forty days after the first publication, to show cause in favor of or against the establishment of the district.

"At the time named in said notice, said board shall meet and hear all property-owners within the proposed drainage district who wish to appear and advocate or resist the establishment of the district and if it deem it is to the best interest of the owners of the real property within the said district, and for the public benefit, that same shall become a drainage district, under the terms of this act; it shall make an order upon its minutes establishing same as a drainage district, subject to all the terms and provisions of this act and amendments thereto; and upon the organization of said drainage district, it shall in its corporate name by its commissioners, henceforth have power to contract and be contracted with, to sue and to be sued, to plead and be impleaded, and to do and perform in the name of such district all such acts and things for the accomplishment of the purposes for which it was organized. If land in more than one county is embraced in the proposed district, the application shall be addressed to the chancery court of any county of such district, and all proceedings shall be had in such chancery court. And the chancery court, or the chancellor in vacation, shall apportion all costs between the county or counties in proportion to the benefit assessed in each county; and such expenses as were incurred prior to the time when such assessment was made shall be apportioned between the counties in the proportion which the chancery court, or chancellor in vacation, shall deem to be just and equitable. Whenever the words 'board of supervisors' or 'president of the board of supervisors'

ARMISTEAD v. SOUTHWORTH. [Sup. Ct.

Opinion of the Court. [139 Miss.

are used in this act, they shall be construed to mean 'chancery court' or 'chancellor' and the words 'clerk of the board of supervisors' to mean 'chancery clerk,' in cases where the district contains land in more than one county. All notices, in that event, shall be published in newspapers having a *bona-fide* circulation in each county in which the district embraces lands. All such districts shall be numbered consecutively or else shall receive names selected by the board of supervisors.

"If the board of supervisors does not act promptly in complying with the terms of this section, or any other section of this act, essential to the creation and operation of drainage districts, it shall be compelled to do so by mandamus."

Section 2, chapter 269, Laws of 1914, reads: "That section 2, of chapter 195, of the laws of the state of Mississippi of 1912, be, and the same is hereby amended to read as follows:

"Section 2. That if upon the hearing provided for in the foregoing section of the petition is presented to the board of supervisors or to the chancellor signed by a majority of the landholders owning one-third of the land, or, one-third of the landholders owning a majority of the land, praying that the improvements be made, it shall be the duty of the board of supervisors or chancellor to make the order establishing the district, without further inquiry, if it appear that the establishment thereof be necessary for the promotion of public health and for agricultural purposes; provided, however, that if upon that day a petition signed by a majority of the landowners owning one-third of the land, or one-third of the landowners owning a majority of the land, be presented to the board of supervisors praying that the improvements be not made, it shall be the duty of the board of supervisors to so order, but if no such petition is filed it shall be the duty of the board of supervisors, or the chancellor to investigate as provided in the preceding section, and to establish such drainage district and if it is of the

opinion the establishment thereof will be to the advantage of the owners of real property therein, and is for the public benefit. And the petition provided for therein may be signed by women, whether married or single, owning land in the proposed district; guardians may sign for their wards, and trustees, executors and administrators may sign for the estates represented ·y them, and if the signature of any corporation theret⸲ ⸲ attested by the corporate seal, the same shall be sufficiє evidence of the assent of the corporation to said peɪ tion.''

Section 33 (a), chapter 269, Laws of 1914, reads: ''That this act shall be liberally construed to promote the ditching, drainage and reclamation of wet, swampy and overflowed lands, and the collection of assessments hereunder shall not be defeated by reason of any omission, imperfection or defect in the organization of any district, or in the proceedings occurring prior to the judgment of the court confirming assessment of benefits and damages; but said judgment shall be conclusive that all prior proceedings were regular and according to law. And in case any assessment shall be held to be void for want of notice, the said commissioners may, upon motion, be permitted to give such owner due notice and ask for a time to be set by the board of supervisors, for hearing any and all objections that said landowner may have to such proceedings and the assessment, and the board of supervisors at such time may make such orders in reference thereto as justice may require and may assess such landowner his proportion of the benefits received by him by such proposed work or the damages suffered by him by such proposed work, and thereupon such assessment as to such land shall be binding and conclusive.''

The drainage district complains that the chancellor was without power to review the action of the commissioners in the change of plans, and in holding that the proposed alterations of the plans materially affected the property-owners. It will be noted that said proposed

change in plan was submitted to the court for its approval, and that notice was given to the property-owners, and that the proposed change was litigated before the chancellor. All parties were in court, especially the appellant, the Abotlopoota drainage district.

We think this change of the plan before the construction of the ditches materially affected the rights of the property-owners who were embraced within the district, and whose property was apparently damaged for the benefit of others within the district without any effort to assess damages.

The case was considered as though the appeal had been prosecuted from an assessment and change of plan by the commissioners, as all parties were before the court and no harm was done to the drainage district by the order of the chancellor, because the original scheme of drainage was entirely departed from by the commissioners, and we think there is no merit in the appeal by the district from the order entered by the chancellor that the objectors north of the levee, whose lands would be damaged by flood waters on account of the levee, were entitled to such damages; that the commissioners were without authority to adopt the changed plans, and that certainly the original assessment could not by any stretch of the imagination be made to apply to a district which had been cut in half. The southern half having the protection of the levee across the district holding off the waters on the lands of the landowners of the northern half of the district, we hold that the assessment roll filed August 15, 1923, was properly vacated.

The changes contemplated by section 17 of the act were minor details in order to work out a perfect scheme, and not a complete change of the original scheme so as to include half of the lands within the district without assessment, and to protect the southern half of the lands with a levee to the damage of the northern lands of the district without any assessment of damages or any change in that regard.

Upon cross-appeal the serious question is presented as to whether or not section 2 of the act is a nullity, or whether because of errors and inaccuracies and the mechanical construction of the act, it is so difficult of interpretation and so uncertain as to be nonenforceable.

Section 1 of the act provides for two hearings. As amended by the Laws of 1922, chapter 213, twenty-five per cent. is inserted in lieu of ten per cent., and, when twenty-five per cent. of the owners of real property within a proposed drainage district file a petition with the clerk of the board of supervisors, it becomes his duty to publish a notice of the intention of the board or the chancellor to take action looking to the organization of the district, and upon the day designated the drainage court is to hear all objections. The drainage court is the board of supervisors if the district be wholly within one county. If within two or more counties, the chancellor of the district constitutes the drainage court.

A majority of the landowners owning a majority of the lands may petition against and object to the organization of the district, the court having the power to proceed in either event. At this first hearing the court enters an order appointing an engineer who will make a general survey of the territory and give a general idea of its character and cost, with suggestions as to ditches, etc., and at said hearing the court is authorized upon petition to appoint three landowners as temporary commissioners.

At the second hearing provided for in section 1, upon the filing of the report of the engineer with the clerk, he again publishes notice to all parties interested, calling upon all persons so desiring to show cause in favor of or against the establishment of the district. At the time named in the notice, the court hears the property owners, and determines whether or not it is to the best interest of the owners of the property to organize the district, and whether or not said district will be a public benefit, and if so, shall organize the district.

It will be noted that it is within the power of twenty-five per cent. of the landowners in number to have the district organized, unless objections are filed.

Section 2 was intended by the legislature as a substitute for section 1, and if read as though section 1 did not exist, in our opinion constitutes a harmonious scheme for the inauguration of a drainage district, provided a majority of the landholders owning one-third of the land, or one-third of the landholders owning a majority of the land, should petition for the hearing in the first instance, and on the day fixed in the notice for the first hearing if the court found that this statutory majority had signed the petition, without further inquiry the court was to ascertain that the petition was so signed by the majority, that the establishment of the district would be to the advantage of the owners of the real property therein and for the public benefit, and that the establishment of the district was necessary for the promotion of health and for agricultural purposes, without appointing an engineer to ascertain a general idea of the district, and without appointing temporary commissioners. In other words, without inquiry along that line, the legislature permitted a majority of the property-owners to pretermit all expense and to have organized at once the drainage district.

Subsequent sections provide for the appointment of commissioners, their duties, for the appointment of engineers by them and other officers, making it a complete scheme by which a majority of the landowners, as defined by the act, might have an organization of the district without expense, on the idea that a majority of them signed the petition knowing the result of so signing, knowing the general condition of the lands, and desiring the organization of the district without the double expense of commissioners, engineers, and attorneys, might so have the district organized.

Section 2 could have no other meaning, and it is the duty of the courts always to give effect if possible to the

statutes enacted by the legislature, and the construction we have thus placed on section 2 of this act, that it is a substitute for section 1, that all parties are in court by proper notice, and that it is the duty of the court, without further inquiry, to grant to a statutory majority of the landowners what they desire. It might be argued that it would be better for them to have attorneys, commissioners, and engineers, and to have the district organized under section 1, but, as we view the act, the legislature has given to the property owners the right to determine this matter for themselves, and the court has no power under section 2 to make the inquiry through commissioners and engineers as provided by section 1.

If there were any doubt about this proposed section, section 33 (a) is curative of all defects up to and including the assessment hearing unless appeal is prosecuted. We take this to mean we are not to place a technical, rigid construction upon this act; that the question of whether a given territory is to be organized into a drainage district or not is a political question left to the people affected thereby; and that the only notice that the legislature regarded as essential to constitute due process of law was the notice given on the filing of the assessment. Indeed, we are of the opinion that, until the assessment of property under this act, there is no reason to suspect that a party's interest will be affected.

This curative section relieves the matter of all doubt as to the power of the people to organize the district a majority desiring so to do. It is obvious that section 1 provides for two hearings, and that section 2 does not say to which of these hearings in express terms, it refers. It is perfectly logical that the words "without further inquiry" make it clear that the legislature intended to substitute section 2 for the first hearing in section 1, as the district is organized under the hearing No. 2 of section 1, and reaches the same final conclusion as is reached by the decree organizing the district in the scheme provided for in section 2. The words "without further inquiry"

758  ARMISTEAD *v.* SOUTHWORTH.  [Sup. Ct.

Opinion of the Court.  [139 Miss.

indicate that it was the purpose of the legislature to permit a majority of the landowners to have created for their benefit a drainage district, if they so desired, without the expense, the delay, and the confusion incident to the two hearings provided for under section 1. Manifestly, the legislature intended by the words "without further inquiry" to allow the majority to create the district in the same manner and with the same force and effect as if the district were organized under hearing No. 2 of section 1.

It is argued that section 2 is a nullity, because two hearings are provided for in section 1, and section 2 is made to refer to the hearing provided for in section 1. This language of section 2 is ambiguous, and it is argued that one cannot tell which hearing in section 1 is pretermitted. The whole question is solvable on the idea that sections 1 and 2 of the act provide two separate alternative schemes for the initiation and organization of a given territory into a drainage district. There can be no good reason assigned why section 2 would not be perfectly valid if section 1 were eliminated and had never been enacted into law.

No constitutional objection is assigned, and we think that section 2, coupled with the succeeding sections of the act, make an entire, complete, legal scheme for the organization of a drainage district. On the other hand, section 2 may be eliminated, and twenty-five per cent. of the voters may follow the plan suggested in section 1 coupled with the balance of the act, and make and constitute a perfectly valid drainage district. The words "without further inquiry" refer to the appointment of temporary commissioners and a temporary engineer, which would not seem to be necessary or essential to the validity of a drainage act. No authority can be cited to that effect.

Chapter 39, Code of 1906, relative to drainage, does not require the report of, or employment of, an engineer preliminary to the organization of a district, but leaves

the matter in the discretion of the commissioners to employ or not to employ, but if employed the engineer is simply to go with the commissioners and make maps and profiles. Chapter 197, Laws of 1912, is almost identical with chapter 39, Code of 1906, and does not require the employment of an engineer as a prerequisite to the organization of the district.

The only difference between section 2, chapter 195, Laws of 1912, and section 2, chapter 269, Laws of 1914, is the erroneous use of the word "of" before the words "the petition" in the second line, and further requires the court to find that the district is for "the public benefit."

So that we have legislative approval of section 2 as an essential part of chapter 269, Laws of 1914. In 1922 the legislature again had this same chapter under review, passed an amendment to section 1, leaving section 2 intact, by which they sought to cure a supposed evil in that a small percentage of landowners could secure the organization of a district. So that three times section 2, as an alternative plan of drainage, has been approved by the legislature directly, and the main features thereof indirectly, in the passage of chapter 39, Code of 1906, and chapter 197, Laws of 1912.

We construe section 2 to be an alternative plan presenting a valid and complete scheme for the organization of a district, entirely feasible, perfectly practical, and without difficulty if so regarded, and by so doing effect is given to the entire chapter in all its parts, and in its essential details necessary to the organization and operation of a drainage district. The chancellor so held, and we agree with that holding.

Upon the other proposition that the notice given is defective there can be no question. The notice assumed that the statutory majority had signed the petition in advance of the hearing, one of the essential things to be adjudicated by the court upon the hearing. The notice should have been given as if the proceedings were under

hearing No. 1 of section 1, and then, if it developed upon the day of the hearing that the statutory majority of landowners had signed the petition, then upon that first hearing it was the duty of the court, having ascertained all of the facts provided for in section 2, to proceed to organize the district, and the notice should not have prejudged this question. But in this case the judgment having been entered and the time having expired for appeal, we do not think that the notice would render the decree organizing the district void. In view of the fact that the district was organized, and that the notice stated what the court afterwards ascertained to be a judicial fact, to-wit, that a statutory majority of the landowners had signed the petition, no harm resulted from this defective notice.

This case is affirmed on direct appeal and on cross appeal, and remanded for further proceedings.

*Affirmed and remanded.*